O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SEAN DITTON,                          )   Case No.
                                      )   CV 12-6932 JGB (JCGx)
                                      )
                  Plaintiff,          )
                                      )   **ORDER GRANTING IN PART**
        v.                            )   **DITTON'S MOTION FOR PARTIAL**
                                      )   **SUMMARY JUDGMENT AND**
                                      )   **GRANTING IN PART BNSF'S**
BNSF RAILWAY COMPANY,                 )   **MOTION FOR SUMMARY JUDGMENT**
                                      )
                                      )
                  Defendant.          )
_____        )
                                      )

        Before the Court are cross motions for summary
judgment, or in the alternative, partial summary judgment
filed by Plaintiff Sean Ditton and Defendant BNSF
Railway.  (Doc. Nos. 35, 50.)  After considering the
papers in support of and in opposition to the motions and
the arguments presented at the May 13, 2013 hearing, the
Court GRANTS IN PART Plaintiff's motion and GRANTS IN
PART Defendant's motion.

# I.   BACKGROUND

## A.   Procedural Background

Plaintiff Sean Ditton ("Plaintiff" or "Ditton") filed his complaint on August 10, 2012.  ("Compl.," Doc. No. 1.)  Defendant BNSF Railway Company answered on August 27, 2012.  (Doc. No. 4.)

BNSF filed its Motion for Summary Judgment, or in the alternative, Partial Summary Judgment, on March 18, 2013. ("Def. Mot.," Doc. No. 35.)  In support of its Motion, BNSF attached:

- Statement of Uncontroverted Facts and Conclusions of Law ("Def. SUF," Doc. No. 36);
- Declaration of V. Alan Arshansky ("Arshansky Decl.," Doc. No. 37) attaching Exhibits A-D and I-O;
- Declaration of Foster Peterson ("Peterson Decl.," Doc. No. 38) attaching his curriculum vitae as Exhibit E;
- Declaration of Shane Cockshott ("Cockshott Decl.," Doc. No. 39) attaching Exhibits F-H; and

1       •    Separately Bound Volume of Exhibits attaching
2            all the exhibits testified to above ("Def.
3            Exhs.," Doc. No. 40).[1]

4

5       Ditton filed his opposition on March 25, 2013.  ("Pl.
6  Opp'n," Doc. No. 45.)  Ditton filed the following
7  documents in support of his opposition:
8       •    Statement of Genuine Issues of Material Fact
9            ("Pl. SGI," Doc. No. 54);
10      •    Objections to Defendant's Proposed Statement of
11           Uncontroverted Facts ("Pl. Opp'n Obj.," Doc. No.
12           46); and
13      •    Separately Bound Volume of Exhibits attaching
14           Exhibits 1-5 ("Pl. Opp'n Exhs.," Doc. No. 45-1).

15

16      On April 15, 2013, BNSF replied ("Def. Reply," Doc.
17  No. 63) and included the following supporting documents:
18      •    Objections to Plaintiff's Evidence in Support of
19           his Opposition ("Def. Reply Obj.," Doc. No 67);
20      •    Response to Plaintiff's Objections to Evidence
21           in Support of BNSF's Motion ("Def. Resp.," Doc.
22           No 66);
23      •    Request for Judicial Notice ("RJN," Doc. No.
24           64);

25  _____

26       [1]  Due to the volume of evidence filed in support of,
    in opposition to, and in reply to each of the two
27  Motions, the Court does not enumerate each attached
    Exhibit, but describes the documents in the evidentiary
28  citations as needed.

3

- Declaration of V. Alan Arshansky ("Arshansky Reply Decl.," Doc. No 65) attesting to Exhibits A-G; and
- Separately Bound Volume of Exhibits attaching Exhibits A-G ("Def. Reply Exhs.," Doc. No. 68).

Ditton filed his cross Motion for Summary Judgment, or in the alternative, Partial Summary Judgment on April 1, 2013. ("Pl. Mot.," Doc. No. 50.) Although Plaintiff styled his Motion as a Motion for Summary Judgment, Plaintiff only provides argument and supporting evidence regarding select elements of his second cause of action. Therefore, the Motion is treated as one for Partial Summary Judgment on his second claim for relief. (See Pl. Mot. at 2; Pl. Reply at 2 n.1.)  In support of his Motion, he filed:

- Statement of Uncontroverted Facts and Conclusions of Law ("Pl. SUF," Doc. No. 52);
- Declaration of Gregory T. Yaeger ("Yaeger Decl.," Doc. No. 51) attaching Exhibits A-F; and
- Separately Bound Volume of Exhibits ("Pl. Exhs.," Doc. No. 51-1) attaching the exhibits testified to in the Yaeger declaration.

BNSF opposed on April 8, 2013 ("Def. Opp'n," Doc. No. 55) and included the following attachments:

1 •    Statement of Genuine Disputes of Material Fact
2      ("Def. SGI," Doc. No. 56);
3 •    Evidentiary Objections to Evidence ("Def. Opp'n
4      Obj.," Doc. No. 60);
5 •    Declaration of V. Alan Arshansky ("Arshansky
6      Opp'n Decl.," Doc. No. 57) attaching Exhibits A-
7      E, G-H;
8 •    Declaration of Foster Peterson ("Peterson Opp'n
9      Decl.," Doc. No. 58);
10 •   Declaration of Lawrence Keller ("Keller Decl.,"
11     Doc. No. 59) attaching Exhibit F; and
12 •   Separately Bound Volume of Exhibits ("Def. Opp'n
13     Exhs.," Doc. No. 61) attaching Exhibits A-H as
14     testified to above.
15
16     Ditton replied on April 15, 2013 ("Pl. Reply," Doc.
17 No. 62) attaching his declaration ("Ditton Decl.," Doc.
18 No. 62-1).
19
20 **B.   Complaint**
21
22     According to his Complaint, Ditton was employed by
23 BNSF at its La Mirada rail yard in Los Angeles,
24 California.  (Compl. ¶¶ 4-5.)  In September 2009, Ditton
25 alleges he attempted to operate a hand brake on a rail
26 car and it failed to operate properly.  (Compl. ¶ 9.)  As
27 a result of the incident, Ditton contends he suffered
28

injury to his back and left leg and subsequently to his right knee.  (Compl. ¶¶ 9, 11.)

Ditton states two claims for relief.  The first alleges that BNSF was negligent in violation of the Federal Employer's Liability Act ("FELA") under 45 U.S.C. § 51.  (Compl. ¶ 10.)  Ditton alleges that BNSF's negligence includes: failing to provide Plaintiff with a reasonably safe place to work, failing to provide Plaintiff with reasonably safe equipment and procedures, failing to provide sufficient and proper training to Plaintiff, and other acts of negligence.  (Id.)  Second, Ditton states a violation of the Federal Safety Appliance Act ("SAA") under 45 U.S.C. § 20302 for strict liability due to a defect in the hand brake.  (Compl. ¶ 16.)

## C.   Motions for Summary Judgment

BNSF's Motion seeks summary judgment on both of Plaintiff's causes of action, including all potential forms of negligence.  (Def. Mot. 2.)  Plaintiff moves for summary judgment on select elements of his second cause of action for strict liability under the SAA.  (Pl. Mot. at 2.)  Plaintiff does not move for summary judgment on the causation or damages elements of his SAA claim.  (See Def. Opp'n at 1.)

Since the Motions rely on the same facts, evidence, and legal arguments, the Court will consider them

1  together.  The Court addresses the SAA claim first,
2  followed by the FELA claim.

3

4              **II.  LEGAL STANDARD**[2]

5

6      Federal Rule of Civil Procedure 56 empowers the Court
7  to enter summary judgment on factually unsupported claims
8  or defenses, and thereby "secure the just, speedy and
9  inexpensive determination of every action." <u>Celotex</u>
10 <u>Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Summary
11 judgment is appropriate if the "pleadings, depositions,
12 answers to interrogatories, and admissions on file,
13 together with the affidavits, if any, show that there is
14 no genuine issue as to any material fact and that the
15 moving party is entitled to judgment as a matter of law."
16 Fed. R. Civ. P. 56(c).  A fact is material when it
17 affects the outcome of the case. <u>Anderson v. Liberty</u>
18 <u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Freeman v. Arpaio</u>,
19 125 F.3d 732, 735 (9th Cir. 1997).
20     The party moving for summary judgment bears the
21 initial burden of establishing an absence of a genuine
22 issue of material fact. <u>Celotex</u>, 477 U.S. at 323.  This
23 burden may be satisfied by either (1) presenting evidence
24 to negate an essential element of the non-moving party's
25 case; or (2) showing that the non-moving party has failed

26

27 ─────────────
28      [2] Unless otherwise noted, all references to "Rule"
   refer to the Federal Rules of Civil Procedure.

1  to sufficiently establish an essential element to the
2  non-moving party's case.  Id. at 322-23.  Where the party
3  moving for summary judgment does not bear the burden of
4  proof at trial, it may show that no genuine issue of
5  material fact exists by demonstrating that "there is an
6  absence of evidence to support the non-moving party's
7  case."  Id. at 325.  The moving party is not required to
8  produce evidence showing the absence of a genuine issue
9  of material fact, nor is it required to offer evidence
10 negating the non-moving party's claim.  Lujan v. National
11 Wildlife Fed'n, 497 U.S. 871, 885 (1990); United
12 Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542
13 (9th Cir. 1989).

14      However, where the moving party bears the burden of
15 proof at trial, the moving party must present compelling
16 evidence in order to obtain summary judgment in its
17 favor.  United States v. One Residential Property at 8110
18 E. Mohave, 229 F. Supp. 2d 1046, 1047 (S.D. Cal. 2002)
19 (citing Torres Vargas v. Santiago Cummings, 149 F.3d 29,
20 35 (1st Cir. 1998) ("The party who has the burden of
21 proof on a dispositive issue cannot attain summary
22 judgment unless the evidence that he provides on that
23 issue is conclusive.")).  Failure to meet this burden
24 results in denial of the motion and the Court need not
25 consider the non-moving party's evidence.  One
26 Residential Property at 8110 E. Mohave, 229 F. Supp. 2d
27 at 1048.
28

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The United States Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Anderson, 477 U.S. at 252. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party. Celotex, 477 U.S. at 325. The Court cannot engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury. Anderson, 477 U.S. at 255. Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient. See Schneider v. TRW, Inc., 938 F.2d 986, 990-91 (9th Cir. 1991).

Cross-motions for summary judgment do not necessarily permit the judge to render judgment in favor of one side or the other. Starsky v. Williams, 512 F.2d 109, 112

1  (9th Cir. 1975).  The Court must consider each motion
2  separately "on its own merits" to determine whether any
3  genuine issue of material fact exists.  <u>Fair Housing</u>
4  <u>Council of Riverside County, Inc. v. Riverside Two</u>, 249
5  F.3d 1132, 1136 (9th Cir. 2001).  When evaluating
6  cross-motions for summary judgment, the court must
7  analyze whether the record demonstrates the existence of
8  genuine issues of material fact, both in cases where both
9  parties assert that no material factual issues exist, as
10 well as where the parties dispute the facts.  <u>See</u> <u>Fair</u>
11 <u>Housing Council of Riverside County</u>, 249 F.3d at 1136
12 (citation omitted).

13

14                    **III. DISCUSSION**

15

16 **A.   Evidentiary Objections**

17

18     Almost all of the objections appended to Plaintiff's
19 opposition, Defendant's opposition, and Defendant's reply
20 are on grounds of relevance under Federal Rule of
21 Evidence 401.  (<u>See</u> Def. Opp'n Obj.; Pl. Opp'n Obj.; Def.
22 Reply Obj.) "Objections to evidence on the ground that
23 it is irrelevant, speculative, and/or argumentative, or
24 that it constitutes an improper legal conclusion are all
25 duplicative of the summary judgment standard itself" and
26 are thus "redundant" and unnecessary to consider here.
27 <u>Burch v. Regents of Univ. of California</u>, 433 F. Supp. 2d
28

1110, 1119 (E.D. Cal. 2006); see Anderson, 477 U.S. at
248 ("Factual disputes that are irrelevant or unnecessary
will not be counted.").  Thus, the Court does not rule on
any of the parties' relevance objections.

     The Court also will not consider Defendant's
objections aimed at Plaintiff's characterizations of or
purported misstatements of the evidence as represented in
his SUF and SGI.  (See, e.g., Def. Opp'n Obj. ¶ 9
("misstates testimony"); Def. Reply Obj. ¶ 39 (objecting
on completeness grounds under Fed. R. Evid. 106 and
misstatement of testimony)).  "Plaintiff's 'evidentiary
objections' to Defendant['s] separate statements of
undisputed facts are not considered because such
objections should be directed at the evidence supporting
those statements." Hanger Prosthetics & Orthotics, Inc.
v. Capstone Orthopedic, Inc., 556 F. Supp. 2d 1122, 1126
(E.D. Cal. 2008); Dalton v. Straumann Co. USA Inc., No.
99-4579, 2001 WL 590038, at *4 (N.D. Cal. May 18, 2001)
("Most of these objections to evidence are actually
objections to defendant's characterization of the
evidence in its 'Statement of Undisputed Facts.'
Plaintiff's counsel objects that statements are vague or
compound as if he were objecting to questions asked in a
deposition.  But counsel is not objecting to evidence,
merely to defendant's characterization of the
evidence.").

1    The only remaining objections are Defendant's
2    objections to the reports attached to the affidavits of
3    Wilson C. Hayes and Michael J. O'Brien submitted in
4    support of Plaintiff's opposition to Defendant's Motion.
5    ("Hayes Report.," Pl. Opp'n Exhs., Exh. 4b; "O'Brien
6    Report," Pl. Opp'n Exhs., Exh. 5b.)  Defendant objects to
7    the reports and the evidence relied on by the experts in
8    the reports on hearsay grounds and for lack of personal
9    knowledge.  (Def. Reply Obj. ¶¶ 22, 40, 41.)
10    The Hayes Report states the affiant's opinion on the
11   force required to release a hand brake, the cause of
12   Ditton's injuries, the reduction in force with the use of
13   a brake stick, and BNSF's negligence.  (Hayes Report at
14   13.)   The O'Brien Report opines on BNSF's compliance with
15   federal statues, BNSF's negligence, and the causes and
16   contributing factors to Ditton's accident.  (O'Brien
17   Report at 2.)  "At the summary judgment stage, [courts]
18   do not focus on the admissibility of the evidence's form.
19   We instead focus on the admissibility of its contents."
20   Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003)
21   (citation omitted).  Since Hayes and O'Brien could
22   testify to their opinions as well as the relevant
23   portions of their reports from personal knowledge, the
24   reports themselves are not hearsay, nor do they lack
25   foundation.  See Fed. R. Ediv. 602, 801; Marceau v. Int'l
26   Bhd. of Elec. Workers, 618 F. Supp. 2d 1127, 1143 (D.
27
28

Ariz. 2009).  The Court OVERRULES Defendant's objections to the Hayes and O'Brien Reports.

   However, the Court will not consider those portions of the reports which rely on or cite to documents and evidence not before the Court.  Written documents relied upon by the affiants must be actually exhibited.  <u>See</u> <u>Freeman v. Kern County, Kern Med. Ctr.</u>, No. 1:07-CV-00219 TAG, 2008 WL 4003978, at *6 (E.D. Cal. 2008) ("'This means that if written documents are relied upon they must actually be exhibited; affidavits that purport to describe a document's substance or an interpretation of its contents are insufficient.'") (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2722 (3d ed. 1998)).  Both the Hayes and O'Brien Reports quote from various documents, including medical records, depositions, manufacturer standards, and newsletters, without attaching them.  "The Court will not simply assume that the experts have accurately quoted or characterized those documents." <u>Harris v. Extendicare Homes, Inc.</u>, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011).  Accordingly, the Court SUSTAINS Defendant's objections to the evidence included in the Hayes and O'Brien Reports to the extent it is not before the Court.

   The Court also will not consider the Deposition of Lawrence Fleischer offered by Defendant in reply to its Motion.  ("Fleischer Depo.," Def. Reply Exhs., Exh. B.)

13

1  The deposition was taken for a separate proceeding before

2  the United States District Court for the District of

3  Oregon in May 2009.  However, the deposition is not

4  properly authenticated pursuant to Federal Rule of

5  Evidence 901, as it was not signed by the deponent, a

6  notary public, or the court reporter.  See Orr v. Bank of

7  Am., NT & SA, 285 F.3d 764, 774 (9th Cir. 2002); Pavone

8  v. Citicorp Credit Servs., Inc., 60 F. Supp. 2d 1040,

9  1045 (S.D. Cal.1997) (excluding a deposition for failure

10  to submit a signed certification from the reporter).

11  Moreover, counsel in this action was not present at the

12  Fleisher deposition and therefore does not lay an

13  adequate foundation for Fleischer's testimony.  See

14  Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1182

15  (9th Cir. 1988) ("The foundation is laid for receiving a

16  document in evidence by the testimony of a witness with

17  personal knowledge of the facts who attests to the

18  identity and due execution of the document and, where

19  appropriate, its delivery.") (citation omitted).  For

20  these reasons, the Court excludes the deposition of

21  Lawrence Fleischer from its consideration of the Motions.[3]

22  _____

23      [3] Defendant also requests that the Court take
    judicial notice of the Fleischer deposition pursuant to
24  the Ninth Circuit's rule that a Court may take judicial
    notice of court filings and proceedings in other courts
25  if they have a direct relation to the matters at issue.
    See Biggs v. Terhune, 334 F.3d 910, 915 n.3 (9th Cir.
26  2003); United States ex rel. Robinson Rancheria Citizens
    Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.
27  1992).  However, the Court may not take judicial notice
    of any matter that is in dispute and may not take notice
28  of the truth of the matters asserted therein.  See Fed.
                                        (continued...)

**B.   Disputed and Undisputed Facts**

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the MSJ.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").  Any facts that the Court finds are disputed are clearly marked as such.

**1.   The Incident**

On September 2, 2009, BNSF employed Ditton as a conductor working at a rail yard located in La Mirada, California.  (Def. SUF ¶ 1; Pl. SGI ¶ 1.)  At approximately 3:00am, Ditton arrived at the rail yard and was assigned to switch out cars from inbound and outbound

---

[3](...continued)
R. Evid. 201(b); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 690 (9th Cir. 2001).  Defendant relies on the Fleischer deposition to prove that BNSF was not aware that brake sticks improved safety, which goes to a material fact in dispute, namely BNSF's reasonableness in not providing brake sticks.  As such, the Court DENIES Defendant's request for judicial notice of the Fleischer deposition.

trains and to organize the cars in the yard.  (Pl. SUF ¶¶
2, 5; Def. SGI ¶¶ 2, 5.)  He was part of a three person
crew including a brakeman and engineer.  (Deposition of
Sean Ditton ("Ditton Depo.") 102:19-25, Pl. Opp'n Exhs.,
Exh. 1.)  Ditton completed his work within the confines
of the rail yard and his tasks did not involve the repair
or maintenance of any train or car.  (Pl. SUF ¶¶ 5-6;
Def. SGI ¶¶ 5-6.)

The final task of Ditton's shift involved switching
selected railcars onto track seven in order to line them
up for trains.  (Ditton Depo. 110:20-111:7.)  Once all
the proper cars were aligned, Ditton and his yard crew
ensured all the cars were connected, or coupled, and then
a locomotive would grab hold of the cars and pull them to
the proper track.  (Ditto Depo. 111:9-20.)  As the
locomotive began to slowly roll, Ditton heard that there
was a brake on one of the rear cars.  (Ditton Depo.
111:24-112:2.)

At that point, Ditton stopped the train and went to
release the vertical hand brake[4] on the second to last
railcar of a train on track number seven.  (Def. SUF ¶ 4;
Pl. SGI ¶ 4.)  The railcar was part of an inbound train
and had not been set aside for repair or maintenance.
(Pl. SUF ¶7; Def. SGI ¶ 7.)  While standing on the
railcar ladder with his left foot on the bottom rung and

_____

[4] A "hand brake" is a "brake[] on cars and engines
that you manually twist or pump" to set and release the
brakes.  (Ditton Depo. 87:13-20.)

his right foot on the car's platform, Ditton held onto the ladder with his left hand and attempted to release the quick release lever of the hand brake with his right hand.  (Pl. SUF ¶ 8; Def. SGI ¶ 8.)  Although Ditton was able to fully actuate the lever, the lever was "stuck" in that it did not release the hand brake.  (Ditton Decl. ¶ 4; Ditton Depo. 131:18-23.)[5]  Next, Ditton attempted to release, or "untie," the brake wheel by hand.  (Ditton Depo. 134:24-135:3.)  In order to untie the brake by hand, Ditton grabbed the underside of the brake wheel with his right hand and attempted to pull it in a counterclockwise direction.  (Ditton Depo. 136:17-137:9.)  Ditton applied steady pressure, but he experienced abnormally heavy resistance during the rotation of the wheel.  (Ditton Depo. 137:15-24; 138:9-139:23.)  Although Ditton admitted that some hand brake wheels require a "pretty firm pull," this was one of the hardest hand

_____

[5] BNSF attempts to dispute the fact that Ditton was able to fully actuate the brake release lever, and argues that Ditton instead testified that the quick release lever "would not move."  (See Def. SGI ¶ 11.)  However, Ditton's deposition does not support this conclusion.  At best, the only relevant sections of the deposition which may support this conclusion are statements by the attorneys, not by Ditton himself.  (See Ditton Depo. 132:13-19.)  More importantly, Ditton subsequently clarified any ambiguity in his deposition testimony with a declaration where he unambiguously indicates he was able to fully actuate the handle.  (Ditton Decl. ¶ 4.)  See Messick v. Horizon Indus., 62 F.3d 1227, 1231 (9th Cir. 1995) ("[P]arty is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.").

1  brakes he untied in the approximately one-year he held
2  this position.  (Ditton Depo. 140:24-144:24.)
3  Nevertheless, Ditton was able to fully release the
4  vertical hand brake using the wheel.  (Ditton Depo. 145:
5  10-13.)  It did not require 100 percent of his strength,
6  and he did not feel it was necessary to call for
7  mechanical assistance.  (Ditton Depo. 195:13-25.)

8       Immediately after untying the brake, Ditton felt a
9  strain or pull in his lower back.  (Ditton Depo. 146:13-
10  14.)  Ditton left the rail yard without completing the
11  switching and without reporting his injury or that the
12  hand brake did not operate properly.  (Def. SUF ¶¶ 14-15,
13  33; Pl. SGI ¶¶ 14-15, 33.)  The following day Ditton
14  returned to work and asked his supervisor, Jason Girdler,
15  if he could have a light day due to the pain in his back
16  caused by the prior day's stuck brake, but Girdler
17  refused.  (Ditton Depo. 155:7-156:8.)  Ditton attempted
18  to work for approximately three hours, but left early to
19  see a doctor about his back pain.  (Ditton Depo. 156:10-
20  160:23.)

21       Ditton completed a BNSF employee injury report on
22  September 22, 2009.  (Def. SUF ¶ 17; Pl. SGI ¶ 17.)
23  Ditton is unable to identify the specific railcar or the
24  specific hand brake which caused his injury.  (Def. SUF
25  ¶¶ 18-19; Pl. SGI ¶¶ 18-19.)  However, Ditton is able to
26  describe that the car was filled with plastic and was
27  "destined for Setco," a BNSF customer.  (Ditton Depo.
28  114:11-15.)  There is no evidence to indicate that Ditton

or BNSF was aware of any report, problem, or complaint with the car or hand brake that Ditton was working on at the time of his injury.  (Ditton Depo. 151:5-8; Deposition of Jason Girdler ("Girdler Depo.") 45:18-21, Def. Exhs., Exh. O.)

## 2.   Rules and Regulations

A General Code of Operating Rules ("GCOR") for all BNSF employees was in effect at the time of the incident. (Cockshott Decl. ¶6.; GCOR, Def. Exhs., Exh. F.)  BNSF also relies on a set of safety rules entitled the BNSF TY&E Safety Rules ("TY&E").  (TY&E, Def. Exhs., Exh. G.) Rule 1.4.7 of the TY&E states that if one person cannot manually handle a load safely, he or she should obtain mechanical assistance or stop and obtain the mechanical means necessary to accomplish the task.  (TY&E ¶ S-1.4.7.)  Rule 13.6.3 describes the body position necessary to operate a vertical hand brake and mirrors the position described in Ditton's deposition at the time of the injury.  (TY&E ¶ S-13.6.3.)  Ditton admits he was familiar with the GCOR and TY&E Rules at the time of the incident.  ("Pl. Resp. RFA" ¶¶ 18-19, Def. Exhs., Exh. I.)

## 3.   Quick Release Lever

1    The quick release lever is designed to release an
2    applied hand brake.  (Pl. SUF ¶ 9; Def. SGI ¶ 9.)   In
3    other words, if a quick release lever is fully actuated,
4    it should disengage the hand brake, making it unnecessary
5    to use the wheel.  (Girdler Depo. 46:5-21; 48:13-17;
6    O'Brien Report at 7.)   However, there is uncontroverted
7    evidence that hand brake release levers commonly become
8    stuck.  (Girdler Depo. 46:13-15; Peterson Decl. ¶ 14;
9    Ditton Depo. 133:4-5.)   Plaintiff encountered numerous
10   stuck brake release levers over the course of his career
11   without sustaining injury. (Def. SUF ¶ 28; Pl. SGI ¶ 28.)
12       The testimony indicates that there are multiple,
13   sometimes conflicting reasons why a brake release lever
14   may become stuck.   Lawrence Keller, a carman who assists
15   with operations of rail equipment on the La Mirada yard,
16   and Foster Peterson, an expert witness and railroad
17   engineer,  both state that the most common reason for a
18   stuck lever or difficult to turn wheel is that the prior
19   user set the brake very tightly.  (Keller Decl. ¶ 7;
20   Peterson Opp'n Decl. ¶ 12.)   The testimony from Lawrence
21   Keller, Foster Peterson, Jack Osborne, Shane Cocksott,
22   and Chad Winholdt, all BNSF train operators, states that
23   a quick release lever's failure to release a railcar hand
24   brake does not "in and of itself," "necessarily," or "in
25   every case" constitute a defect of the hand brake.
26   (Keller Decl. ¶ 5; Peterson Opp'n Decl. ¶ 11; Deposition
27   of Jack Osborne ("Osborne Depo.") 29:16-25, Pl. Opp'n
28   Exhs., Exh. 3; Deposition of Shane Cockshott ("Cockshott

Depo.") 51:11-18, Pl. Opp'n Exhs., Exh. 2, as amended by
Errata Sheet, Def. Reply Exhs., Exh. E.; Deposition of
Chad Weinholdt ("Weinholdt Depo.") 23:7-12, Def. Reply
Exhs, Ex. B.)[6]  Ditton's expert, however, states that "if
operation of the quick release lever fails to effect
release of a hand brake, the hand brake is defective."
(O'Brien Report at 11.)

     If a release lever is stuck and a mechanic has
inspected the handle and determined it does not work,
then the hand brake would be considered defective and the
entire apparatus would be replaced.  (Weinholdt Depo.
25:7-18.)  No repairs are made to quick release handles
because "it's all part of the hand brake."  (Id.)

### 4.  Proper Procedures and Training

     There is uncontroverted evidence that Ditton received
training from BNSF on the operation of vertical hand
brakes, including how to tie and untie them.  (Def. SUF ¶
38; Pl. SGI ¶ 38.)  The contents of the training is
disputed.

_____

[6] Ditton attempts to dispute this testimony by
pointing to selected sections of the Weinholdt and
Cockshott depositions to assert that quick release levers
are defective when they fail to release the hand brake.
(See Pl. SUF ¶ 10.)  When read in their totality,
Weinholdt and Cockshott's testimony do not support this
proposition.  Both declarants subsequently qualified
their testimony to indicate that a brake is not defective
until a mechanic has determined that to be the case.
(See Weinholdt Depo. 23:14-24:21; Cockshott Depo. 51:11-
18, as amended by Errata Sheet.)

1     Specifically, the parties disagree over the proper
2  procedure to use when a quick release lever on a vertical
3  hand brake becomes stuck.  Some evidence indicates that
4  the proper procedure is to attempt the brake release
5  lever, then try to turn the wheel, and if both fail or
6  are difficult, to obtain assistance or report the issue.
7  For example, Rule 13.6.6 of the TY&E outlines the
8  procedure for releasing a vertical hand brake and states:
9  "[i]f the quick release lever does not release the brake,
10 operate the wheel with steady pressure.  If the wheel
11 does not easily release the brake, apply air to the car
12 or get help.  If the brakes still do not operate, bad-
13 order the car."  (TY&E ¶ S-13.6.6.)  Similarly, Jason
14 Girdler, an assistant train master at the La Mirada yard
15 at the time of the incident, testified that when a hand
16 brake lever is stuck, an operator can use the alternative
17 method of turning the brake wheel.  (Girdler Depo. 46:5-
18 21.)  If the hand brake lever fails and the wheel is
19 difficult to turn, an operator should report the issue to
20 the supervisor or mechanic on duty.  (Girdler Depo. 47:1-
21 7.)

22    Contrary evidence from other BNSF employees indicates
23 that the proper procedure is to cease operation of the
24 hand brake and report the issue once the release lever
25 fails to release the brake.  (Osborne Depo. 28:24-29:14;
26 Cockshott Depo. 51:8-14.)  There is evidence to show this
27 is the training all BNSF operating department personnel,
28

such as Ditton, should have received.  (Osborne Depo.
30:20-23; Cockshott Depo. 51:21-52:5.)

### 5.  Brake Stick

A brake stick is a tool that can be used to set and
release hand brakes from the ground.  (Hayes Report ¶
19.)  It is a retractable and expandable steel pole with
a hook on the end.  (Ditton Depo. 109:10-12; Peterson
Decl. ¶ 12.)  An operator stands on the ground, holds the
brake stick with both hands, places the hook between the
spokes of the hand brake wheel and pulls to release or
set the brake.  (Peterson Decl. ¶ 13.)

There is some dispute as to the purpose of a brake
stick.  Defendant produces evidence to show that brake
sticks are not intended to be used to release more
difficult hand brakes, nor are they to be used to operate
a hand brake release lever.  (Peterson Decl. ¶ 13.)
However, the testimony of Ditton and his expert witnesses
shows that using a brake stick reduces the force required
to release the brake wheel and reduces the loading on the
operator's lumbar spine.  (Hayes Report ¶ 19; Ditton
Depo. 166:20-167:7; O'Brien Report ¶ 24.)

Ditton never used a brake stick while he worked at
the La Mirada yard.  (Pl. Resp. RFA ¶ 29.)  Ditton's co-
workers, including Jason Girdler, Jack Osborne, and Shane
Cockshott, also have never seen brake sticks used at the
La Mirada yard.  (Girdler Depo. 45:14-17; Osborne Depo.

32:5-33:9; Cockshott Depo. 24:9-11.)  Although there is
no evidence to show that brake sticks have ever been used
at the La Mirada yard (Def. SUF ¶ 26; Pl. SGI ¶ 26),
there is uncontroverted evidence that BNSF uses brake
sticks at other yards it operates around the country
including in Montana and Denver.  (Cockshott Depo. 23:12-
14; Ditton Depo. 94:23-25; Girdler Depo. 20:16-22.)  BNSF
also provides some training on the use of the brake
sticks.  (Osborne Depo. 32:5-21.)

There is disputed evidence regarding whether Ditton
ever requested to use a brake stick while working at the
La Mirada yard.  Ditton testified that he asked Jack
Osborne, a trainmaster and one of his supervisors, to
procure brake sticks to use at the La Mirada yard in
order to make it less strenuous to set and release hand
brakes, but Osborne refused.  (Ditton Depo. 95:6-25.)
Osborne does not recall discussing brake sticks with any
personnel in Los Angeles, and does not recall any
operating department personnel requesting to use them.
(Osborne Depo. 32:25-33:9.)

The parties could not identify any BNSF safety rules,
GCORs, or federal regulations which require that hand
brakes be operated with the use of brake sticks.  (Def.
SUF ¶¶ 29-30; Pl. SGI ¶¶ 29-30.)  BNSF's expert also
states that the "universally accepted method for
operation of hand brakes has always been by hand" and not
with the aid of a brake stick.  (Def. SUF ¶ 41; Pl. SGI ¶
41.)

1

## C.   Federal Safety Appliance Act

3

4          The Federal Safety Appliance Act ("SAA"), 49 U.S.C. §
5     20301 *et. seq.*, was enacted in 1883 to address the
6     alarming number of railroad crewmen suffering injuries on
7     train equipment.  <u>See</u> <u>Reed v. Philadelphia, Bethlehem &</u>
8     <u>New England R. Co.</u>, 939 F.2d 128, 130 (3d Cir. 1991).  It
9     "requires rail cars to be equipped with enumerated safety
10    features, such as certain types of couplers, brakes,
11    running boards, and handholds."  <u>Union Pacific R. Co. v.</u>
12    <u>California Public Utilities Com'n</u>, 346 F.3d 851 (9th Cir.
13    2003).  The SAA does not create a private cause of
14    action, but railroad employees who allege that they have
15    been injured as a result of a safety violation may sue
16    under the Federal Employer's Liability Act ("FELA"), 45
17    U.S.C. § 51 *et. seq.*  <u>See</u> <u>Crane v. Cedar Rapids & Iowa</u>
18    <u>City Ry. Co.</u>, 395 U.S. 164, 166 (1969).  Under the SAA, a
19    railroad is liable in strict liability when certain
20    equipment is not kept in the prescribed condition and
21    results in injury to an employee.  <u>See</u> <u>id.</u> ("In such
22    actions, the injured employee is required to prove only
23    the statutory violation and thus is relieved of the
24    burden of proving negligence.") (internal citations
25    omitted); <u>O'Donnell v. Elgin, J. & E. Ry. Co.</u>, 338 U.S.
26    384, 390 (1949).

27

28         1.   "Vehicle" Provision Applies

1    As currently enacted, the SAA applies to two primary
2  forms of rail transportation: vehicles and trains.  49
3  U.S.C. § 20302.  A "vehicle" is defined as a "car,
4  locomotive, tender[7] or similar vehicle."  49 U.S.C. §
5  20301.  The "vehicle" provision applies here as it
6  pertains to individual railcars such as the one Ditton
7  was working on at the time of his injury.  See Williams
8  v. Norfolk S. Ry. Co., 126 F. Supp. 2d 986, 989 (W.D. Va.
9  2000) (applying the "vehicle" provision of the SAA to a
10  plaintiff who was attempting to release a hand brake on a
11  rail car).  By comparison, the SAA requires that "trains"
12  be equipped with "enough" cars with "power or train
13  brakes" to enable the engineer to control the train's
14  speed.  49 U.S.C. § 20302(a)(5)(A).  Clearly, this
15  provision of the SAA is irrelevant to the railcar which
16  allegedly caused Ditton's injury since there was only one
17  car at issue and it was stationary.  Therefore, the
18  vehicle provision of the SAA which directly references
19  "efficient hand brakes" as a required piece of safety
20  equipment is at issue in this case.  49 U.S.C. §
21  20302(a)(1)(A).  The relevant language of the vehicle
22  provision of the SAA states: "a railroad carrier may use
23  or allow to be used on any of its railroad lines . . . a
24  vehicle only if it is equipped with . . . efficient hand
25  brakes . . . ."  49 U.S.C. § 20302.

26  _____

27    [7] The American Heritage Dictionary defines "tender"
28  as a railroad car attached to the rear of a train and
   designed to carry fuel and water.  American Heritage
   Dictionary (4th ed. 2009).

1

2    **2.   Vehicle Was "In Use"**

3

4        Citing <u>Brady v. Terminal R. Ass'n of St. Louis</u>, 303

5    U.S. 10, 13 (1938), the parties argue that the central

6    question is whether the car was "in use" in accordance

7    with the language of the SAA when Ditton was injured.  If

8    the car was not in use, the SAA does not apply and BNSF

9    cannot be liable in strict liability.  <u>See</u> <u>id.</u> at 15.

10   The Ninth Circuit has never discussed when a vehicle is

11   "in use" for the purposes of the SAA, and the parties

12   rely on unsettled case law in several other circuits for

13   their arguments.

14       First, the Court recognizes that the "in use" inquiry

15   is fact intensive and thus differs depending on whether

16   it is being applied to "trains" or "vehicles" within the

17   meaning of the statute.  Since at least 1910, the SAA has

18   had separate statutory provisions and separate safety

19   requirements for "vehicles" (formerly "cars") and

20   "trains."  <u>Compare</u> 45 U.S.C. §§ 1, 11 (1910), as cited

21   in <u>Williams</u>, 126 F. Supp. 2d at 989 <u>with</u> 49 U.S.C. §

22   20302 (1994).  As such, the Court cannot apply the "in

23   use" caselaw indiscriminately, but must be mindful of

24   whether the safety equipment applies to vehicles or

25   trains.  <u>Compare</u> <u>Brady</u>, 303 U.S. at 12 (applying the "in

26   use" requirement to cars) <u>with</u> <u>United States v. Seaboard</u>

27   <u>Air Line R. Co.</u>, 361 U.S. 78, 80 (1959) (applying the "in

28   use" requirement to trains).  The Supreme Court

recognized the importance of this distinction in <u>United States v. Erie R. Co.</u>, 237 U.S. 402 (1915), where it noted "[i]t will be perceived that the air-brake provision deals with running a train, while the other requirements relate to hauling or using a car. In one a train is the unit and in the other a car." <u>Id.</u> at 407-08.

Defendant relies on two tests for the "in use" requirement developed by the Fourth and Fifth Circuits. <u>See</u> <u>Deans v. CSX Transp., Inc.</u>, 152 F.3d 326, 329 (4th Cir. 1999) (applying a "multiple factors test" and considering (1) the location of the train at time of incident and (2) the activity of the injured party); <u>Trinidad v. Southern Pacific Transp. Co.</u>, 949 F.2d 187 (5th Cir. 1991) (applying the "bright line test" and holding that a "train" is not "in use" until switching is complete, the train is assembled, and all pre-departure inspections are complete).  As noted by Plaintiff, a handful of lower courts have derided these cases for applying a uniform standard to the distinct statutory provisions for vehicles and trains.  <u>See</u> <u>White v. BNSF Ry. Co.</u>, C09-5188RJB, 2010 WL 1186197, at *5 (W.D. Wash. Mar. 23, 2010); <u>Underhill v. CSX Transp., Inc.</u>, No. 1:05-CV-196-TS, 2006 WL 1128619 (N.D. Ind. Apr. 24, 2006). The Court finds the reasoning in these cases persuasive. Moreover, given the discrete statutory language and binding Supreme Court precedent, the Court need not rely on these out-of-circuit cases here.

1      In multiple instances, the Supreme Court has
2   recognized the application of the SAA to cases in which
3   the employee was injured while operating a hand brake on
4   a railcar.  In Swinson v. Chicago, St. P., M. & O. Ry.
5   Co., 294 U.S. 529, 530 (1935), an accident occurred while
6   the employee was releasing a hand brake at the end of a
7   tank car and the grab iron he was standing on gave out
8   underneath him.  Id. at 530.  The Court upheld the
9   application of the SAA to the employee for his resulting
10  injuries.  Id. at 532.  Similarly, the facts in Myers v.
11  Reading Co., 331 U.S. 477 (1947), closely parallel those
12  here.  The plaintiff in Myers was working as a conductor
13  and in charge of a three person crew assigned to move a
14  string of cars onto a track, couple those cars to three
15  others, and then "tie the hand-brakes on."  Id. at 479.
16  Plaintiff noticed that one of the brakes was not properly
17  tied and he climbed onto the platform and tried to set
18  the brake by turning the wheel.  Id.  The brake wheel was
19  stiff at first, but then it kicked back and caused
20  plaintiff to fall.  Id. at 480-81.  Although the Court
21  did not directly address the "in use" requirement, the
22  Court upheld the SAA's "prohibition against the
23  respondent's using or permitting to be used, on its line,
24  any car not equipped with 'efficient hand brakes.'"  Id.
25  at 482.  Since the Supreme Court has applied the strict
26  liability requirements of the SAA to facts nearly
27  identical to those presented here, the Court finds that
28  the "vehicle" Ditton was on at the time of his injury was

1   "in use" for the purposes of the SAA.

2       Other key factors identified in <u>Brady</u> as relevant to

3   the "in use" requirement confirm the Court's holding.  In

4   <u>Brady</u>, the Court held that "[t]he car was still in use,

5   though motionless," and it was "not a case where a

6   defective car has reached a place of repair" or was

7   "withdrawn from use".  303 U.S. at 13.  Similarly here,

8   the railcar was motionless, but it was not on a track for

9   repair nor was it withdrawn from use.  The car was filled

10  with goods and was being prepared to join a customer's

11  train.  Moreover, Ditton's work did not involve any

12  maintenance or repair of the car.  Thus, the stated

13  purpose of the "in use" limitation – "to give railcar

14  operators the opportunity to inspect for and correct

15  safety appliance defects before the FSAA exposes the

16  operators to strict liability for such defects" – is not

17  implicated here because Plaintiff's task at the time of

18  the accident was not preparatory to an inspection or

19  repair of the railcar.  <u>Phillips v. CSX Transp., Inc.</u>,

20  190 F.3d 285, 288 (4th Cir. 1999).  There appears no

21  sound rationale for excluding application of the SAA in

22  this case.

23      BNSF argues that the railcar at issue cannot be

24  considered "in use" because Ditton was engaged in

25  switching out cars at the time of his injury and

26  "switching operations [are] not train movements within

27  the meaning of the [SAA]." <u>United States v. Seaboard Air</u>

28  <u>Line R. Co.</u>, 361 U.S. 78, 80 (1959).  BNSF further quotes

Seaboard for the principle that "[a] moving locomotive
with cars attached is without the provision of the act
only when it is not a train; as where the operation is
that of switching, classifying and assembling cars within
railroad yards for the purpose of making up trains." Id.
at 81.  The inapplicability of this rule is evident from
the language itself.  As described by the Court, this
principle applies to "a moving locomotive with cars
attached," which is not at issue here where Ditton was on
a stationary car.  Moreover, this rule specifically
applies to "trains," not vehicles.  Just because a moving
locomotive with cars attached is not a train for the
purposes of the SAA does not mean a railcar cannot be
considered a vehicle for the purposes of the act.  This
understanding is confirmed by the facts at issue in
Seaboard where the Court examined the applicability of
the SAA provision requiring a "train" to have power
brakes on not less than 50 percent of its cars.  Id. at
78.  A nearly identical provision of the act is in effect
today under the SAA's regulation of "trains."  See 49
U.S.C. § 20302(a)(5)(B).  Thus, Seaboard dealt with the
"in use" requirement as it pertains to trains, not
vehicles.  Finally, BNSF ignores the language in Erie
where the Supreme Court noted that the "provisions
[applying to cars] are of broader application and embrace
switching operations as well as train movements, for both
involve a hauling or using of cars."  Erie, 237 U.S. at
408.  The Court thus finds that Seaboard is not

1  controlling here.   Instead, the fact that Ditton was
2  engaged in switching out cars at the time of his injury
3  indicates that the "vehicle" was "in use" and the SAA
4  applies.   <u>Id.</u>
5      If the Court were to exclude railcars engaged in
6  switching operations from the vehicle provision of the
7  SAA, the "efficient hand brake" section would be rendered
8  nearly useless.   Hand brakes are primarily used to stop
9  railcars during the switching of cars within the yard,
10 whereas air brakes are used to stop completed trains.
11 <u>See</u> 49 U.S.C. § 20302(a)(5)(A) (requiring trains to be
12 equipped with enough power or train brakes "so that the
13 engineer on the locomotive hauling the train can control
14 the train's speed without the necessity of brake
15 operators using the common hand brakes for that
16 purpose").   If the Court adopted BNSF's argument, it is
17 difficult to see when the "efficient hand brake"
18 provision would ever apply to a "vehicle" as anticipated
19 by the statutory language.   "Assuming Congress did not
20 intend to enact a nullity, this interpretation cannot be
21 correct."   <u>See</u> <u>Williams</u>, 126 F. Supp. 2d at 992
22 (rejecting BNSF's argument).
23     The Court GRANTS partial summary judgment to
24 Plaintiff as to the "in use" requirement of the SAA.
25
26     **3.   Efficient Hand Brakes**
27
28     As stated above, the SAA requires railroads to use

32

vehicles that are equipped with "efficient hand brakes." 49 U.S.C § 20302(a)(1)(B). The Court now turns to whether the hand brakes on the car at issue were "efficient" within the meaning of the SAA.

"There are two recognized methods of showing the inefficiency of hand brakes equipment. Evidence may be adduced to establish (1) some particular defect, or the same inefficiency may be established by showing (2) a failure to function, when operated with due care, in the normal, natural, and usual manner." Myers v. Reading Co., 331 U.S. 477, 483 (1947).

Before the Court can address the test for efficiency, it must address the fact that Ditton's claims are based on an assertion that the quick release lever was inefficient, not the hand brake itself. (Pl. Reply at 10.) The Court must determine whether the quick release lever is in the category of safety appliances covered by the SAA. In Southern Pac. Co. v. Carson, 169 F.2d 734 (9th Cir. 1948), the court held that a "brake club," which was used to wind the brake wheel, was an essential part of a "hand brake," and the hand brake provision of the SAA therefore governed plaintiff's claim. Id. at 738. The court reasoned that "it can not rationally be said that the brake club did not constitute a part of the hand brake. The club was not a contrivance separate and distinct from the brake, nor was it designed or used for a purpose apart from the use of the brake. On the contrary, it was confessedly designed and used for a

1   purpose inseparable from the use of the braking
2   appliance." Id. at 737. Southern Pacific's reasoning
3   applies to Ditton's claims regarding the quick release
4   lever.  The undisputed facts show that quick release
5   levers are "all part of the hand brake." (Weinholdt
6   Depo. 25:7-18.)  The lever was designed and used for a
7   purpose inseparable from disengaging the hand brake (Def.
8   SGI ¶ 9) and if a defect in the lever is reported, the
9   entirety of the hand brake is replaced (Weinholdt Depo.
10  25:7-18.).  It cannot rationally be said that the quick
11  release handle did not constitute a part of the hand
12  brake, and thus the hand brake provision of the SAA
13  governs Ditton's claim.  See also Johnson v. Union Pac.
14  R. Co., C-03-04574 RMW, 2004 WL 2403844, at *4 (N.D. Cal.
15  Oct. 27, 2004) (holding that an "air hose support strap
16  is part of the air brake system and thus a safety
17  appliance under the SAA").
18      Since the quick release lever is a safety appliance
19  under the SAA, then BNSF is subject to strict liability
20  if a defect in or failure of that appliance contributed
21  in fact to Ditton's injury.  See id.  Based on the
22  controverted evidence presented in Section III.B.3 supra,
23  the Court cannot find that the quick release lever was
24  defective.  The parties present conflicting testimony on
25  the issue of defect such that a reasonable juror could
26  find either that the quick release lever was or was not
27  defective at the time of the injury.
28      The alternate method for demonstrating inefficiency

34

requires evidence to establish that the brake release
lever failed to function when operated with due care, in
the normal, natural, and usual manner.  <u>Myers</u>, 331 U.S.
at 483.  The Court finds that the uncontroverted evidence
demonstrates that the quick release lever did not fail to
function in the "normal, natural, and usual manner."
Instead, the normal, natural, and usual manner of
operation of a brake release lever includes the common
occurrence that the lever will fail to release the brake.
Undisputed evidence demonstrates that brake release
levers commonly become stuck.  (Peterson Decl. ¶ 14.)
Ditton admits he encountered numerous stuck brake release
levers during his career.  (Pl. SGI ¶ 28.)  Thus, the
usual operation of the brake release lever includes the
possibility that it will fail to release the hand brake.
<u>See</u> <u>Willis v. BNSF Ry. Co.</u>, 11-1208, 2013 WL 1000802, at
*5 (C.D. Ill. Mar. 13, 2013) (finding that the hand brake
did not fail to function where "[a]ll the witnesses have
acknowledged that the hand brake operated as it always
did and that slippage was normal and natural").

     Based on the foregoing analysis, the Court DENIES
Plaintiff's motion for partial summary on his claim that
the hand brake was inefficient within the meaning of the
SAA.  Controverted evidence prevents the Court from
finding that the lever was defective as a matter of law,
and no reasonable juror could find that the brake release
lever failed to operate in the normal and usual manner.
Accordingly, Plaintiff and Defendant's motions for

summary judgment on the SAA claim are DENIED.

**D.  Federal Employer's Liability Act**

BNSF moves for summary judgment on Ditton's FELA claim.  The Federal Employer's Liability Act ("FELA") states in relevant part:

> "Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury [] resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence in its cars, engines, appliances, . . . or other equipment."

45 U.S.C. § 51.  FELA "is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." Urie v. Thompson, 337 U.S. 163, 182 (1949).  A FELA plaintiff bears the burden of proving the existence of a duty owed by the defendant, a breach of that duty, causation, and damages.  See Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 538 (1994).  Under the statute, a railroad breaches its duty to its employees by failing to provide a safe working environment if it knew or should have known that it was not acting adequately to protect its employees. Urie, 337 U.S. at 181-82.

The standard for receiving a jury trial is less stringent in FELA cases than in common law tort cases.

36

1  <u>Mullahon v. Union Pac. R.R.</u>, 64 F.3d 1358, 1363 (9th Cir.

2  1995).  This relaxed standard applies to both negligence

3  and causation determinations.  <u>Pierce v. Southern Pac.</u>

4  <u>Transp. Co.</u>, 823 F.2d 1366, 1370 (9th Cir. 1987) ("A

5  reviewing court must uphold a verdict even if it finds

6  only 'slight' or 'minimal' facts to support a jury's

7  finding of negligence."); <u>Oglesby v. Southern Pac.</u>

8  <u>Transp. Co.</u>, 6 F.3d 603, 607 (9th Cir. 1993) ("Under [the

9  FELA] the test of a jury case is simply whether the

10 proofs justify with reason the conclusion that employer

11 negligence played any part, even the slightest, in

12 producing the injury.") (quotation omitted).  In order to

13 defeat summary judgment in FELA cases, the plaintiff need

14 only show that it is "not outside the possibility of

15 reason" that defendant was negligent.  <u>Mendoza v.</u>

16 <u>Southern Pac. Transp. Co.</u>, 733 F.2d 631, 633 (9th Cir.

17 1984).

18     Ditton pursues his negligence claim against BNSF on

19 four grounds for: (1) failing to provide Plaintiff with a

20 reasonably safe place to work, (2) failing to provide

21 Plaintiff with reasonably safe equipment and procedures,

22 namely a brake stick, (3) failing to provide sufficient

23 and proper training to its employees, and (4) other acts

24 of negligence.  BNSF argues that summary judgment is

25 proper on Ditton's FELA claim because (1) he can not

26 establish the element of foreseeability, (2) he has

27 insufficient evidence to support his training claim, (3)

28 BNSF had no duty to provide Ditton with a brake stick,

(4) Ditton has not identified any other acts of negligence, and (5) Plaintiff was the sole cause of his injury.

The Court discusses these arguments in turn and finds that controverted facts prevent the Court from entering summary judgement on Plaintiff's FELA claim.

### 1.   Foreseeability

"[R]easonable foreseeability of harm . . . is an essential ingredient of [FELA] negligence" as part of the element of duty.  <u>CSX Transp., Inc. v. McBride</u>, 131 S. Ct. 2630, 2643 (2011) (quotation omitted).  "[T]he railroad's duties are measured by what is reasonably foreseeable under like circumstances."  <u>Id.</u> (citation omitted).  "[I]f a person has no reasonable ground to anticipate that a particular condition . . . would or might result in a mishap and injury, then the party is not required to do anything to correct the condition." <u>Id.</u> (citation and quotation omitted).

BNSF argues that since it did not have actual or constructive notice of the alleged defect with the hand brake on Ditton's car prior to the incident, Plaintiff's injury was not reasonably foreseeable.  (Def. Mot. at 10.)  Defendant bases his argument on the idea that BNSF needed to have notice of the particular defect on this particular car in order to be held liable under FELA. However, the foreseeability requirement under FELA cannot

1  be read so narrowly.  See Gallick v. Baltimore & O. R.
2  Co., 372 U.S. 108 (1963) (rejecting the argument that
3  "since there had been no similar incidents at this pool
4  in the past, the respondent had no specific reason for
5  anticipating a mishap or injury to petitioner" as "a far
6  too narrow a concept of foreseeable harm to negative
7  negligence under the Federal Employers' Liability Act");
8  Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1158
9  (11th Cir. 2012) ("No authority exists for the
10 proposition that the failure to identify the rail car,
11 standing alone, provides a sufficient basis for summary
12 judgment in [defendant]'s favor.").  The lack of prior
13 reports or complaints regarding the subject hand brake
14 and Ditton's failure to specifically identify the car
15 causing his injury do not establish as a matter of law
16 that injury was not foreseeable.

17     BNSF did have actual or constructive notice that
18 brake release levers commonly get stuck and hand brake
19 wheels can be difficult to turn.  Multiple BNSF employees
20 testified and BNSF's own expert acknowledged that these
21 are routine occurrences.  The Court cannot find as a
22 matter of law that given this knowledge BNSF had no
23 reasonable grounds to anticipate that these conditions
24 could result in injury.  First, it is reasonable to
25 conclude that wheels which require a substantial amount
26 of force to unwind could cause injury.  Moreover, viewing
27 the facts in the light most favorable to Plaintiff, there
28 is evidence to show that release levers which fail to

1  disengage the brake are to be reported, and an operator
2  should not untie the brake using the wheel.  Assuming
3  that this is the proper procedure, it is reasonable to
4  assume that any use of the wheel would be improper due to
5  its potential for injury.  Plaintiff also provides
6  evidence to show that BNSF uses brake sticks at other
7  yards and this reduces the force necessary to turn a
8  brake wheel and the risk of spinal injury.  Finally, the
9  O'Brien Report indicates that "[h]and brake injuries are
10 a well-known, industry-wide issue." (O'Brien Report at
11 14.)  From this knowledge, it is reasonable to conclude
12 that BNSF should have been aware of the need to
13 ameliorate the risks of injury from failed brake release
14 levers and operation of a brake wheel without a brake
15 stick.  The Court finds that this evidence raises a jury
16 question regarding foreseeability under FELA.

17 Plaintiff also convincingly argues that BNSF may be
18 considered to have constructive notice of dangers it
19 could have discovered through proper inspection prior to
20 the injury.  See Tappero v. S. Pac. Transp. Co., 859 F.2d
21 154 (9th Cir. 1988) (holding that a reasonable jury could
22 find that defendant was negligent for failing to
23 adequately inspect the rail); Williams v. Atlantic Coast
24 Line R. Co., 190 F.2d 744, 748 (5th Cir. 1951).  There is
25 not enough evidence for the Court to conclude that a
26 proper inspection would have uncovered the danger which
27 caused Ditton's injury.  Nevertheless, Plaintiff raises a
28 genuine issue which is best left for a jury to decide.

1    BNSF argues that Ditton chose an unsafe means to
2  perform his work, in violation of the GCOR and TY&E
3  safety rules, and therefore Ditton must show that the
4  railroad should have anticipated or reasonably expected
5  that he would choose the unsafe method.  (Def. Reply at 6
6  (citing Frizzell v. Wabash Ry. Co., 199 F.2d 153 (8th
7  Cir. 1952).)  Specifically, Rule 13.6.6 of the TY&E
8  states that if a wheel does not easily release, an
9  operator should apply air to the car or get help.  By
10 failing to follow this rule, BNSF contends Ditton chose
11 an unsafe means of performing his work.  However, a
12 violation of a safety rule or regulation may be evidence
13 that Ditton performed his work unsafely, but it does not
14 demonstrate per se unsafe behavior.  Cf. Robertson v.
15 Burlington N. R. Co., 32 F.3d 408, 410 (9th Cir. 1994)
16 (admitting safety standards as evidence of negligence in
17 a FELA case, but not as proof of negligence per se).
18 Considering the evidence in Plaintiff's favor, there is
19 competent evidence to show that Ditton was untying the
20 brake safely, as indicated by his proper body position
21 and his ability to successfully untie the brake using
22 steady pressure.  As such, the Court finds that a trier
23 of fact could reasonably conclude that Ditton was not
24 performing his work unsafely and the higher evidentiary
25 burden for foreseeability is not implicated.
26    Ditton's evidence is sufficient to create a genuine
27 issue of material fact as to what BNSF knew or should
28 have known about the dangers of stuck brake release

levers and laborious brake wheels.  Similarly appropriate
for a jury is the question of whether BNSF should have
taken measures, such as by providing brake sticks, to
reduce the dangers caused by these conditions.  See
Allenbaugh v. BNSF Ry. Co., 832 F. Supp. 2d 1260, 1263-65
(E.D. Wash. 2011).  Accordingly, the Court DENIES
Defendant's summary judgment motion on the ground that
Plaintiff's injuries were not reasonably foreseeable to
BNSF.

### 2.  Training

    BNSF argues that it is entitled to summary judgment
on Plaintiff's inadequate training claim because
Plaintiff failed to show that BNSF's hand brake training
was insufficient.  The Court cannot grant summary
judgment on this claim.  The evidence indicates that
employees at BNSF received divergent training on how to
properly operate a vertical hand brake.   In many
instances, the BNSF employee training differed from the
procedure outlined in BNSF's safety rules.  Some
employees testified that they were trained to cease
operating the hand brake once the brake release lever
failed.  Plaintiff argues that if he received this
training it would have prevented his injuries because he
would not have attempted to turn the resistant wheel.
Cf. Dickerson v. Staten Trucking, Inc., 428 F. Supp. 2d
909, 915 (E.D. Ark. 2006).  Given that the training and

procedures differed widely, a reasonable finder of fact
could determine that some BNSF employees, including
Plaintiff, received inadequate training on the operation
of vertical hand brakes.  See Lynch v. Ne. Reg'l Commuter
R.R. Corp., 700 F.3d 906, 913 (7th Cir. 2012) ("[A] jury
could determine that the failure to provide training in
fence installation left the crew members ill-equipped to
adjust to non-standard conditions . . . .").

Since a dispute exists as to a material fact, namely
the contents of the provided training, the Court DENIES
Defendant's motion for summary judgment on Plaintiff's
inadequate training claim.

### 3.  Brake Stick

A railroad carrier's duties under the FELA includes
the duty to provide "reasonably safe and suitable tools,
machinery and appliances with which to work." Ragsdell
v. Southern Pac. Transp. Co., 688 F.2d 1281, 1283 (9th
Cir. 1982).  FELA contemplates that a carrier will
provide those tools necessary to eliminate those dangers
which could be removed by reasonable care on the part of
the employer.  Padgett v. Southern Ry., 396 F.2d 303, 306
(6th Cir. 1968).  Nevertheless, a railroad "is not
required to furnish the employee with the latest, best,
or most perfect appliances with which to work." Chicago
& Northwestern Ry. Co. v. Bower, 241 U.S. 470, 474
(1916).  Ditton states a claim for relief on the ground

that BNSF reasonably should have provided him with a
brake stick to release hand brakes on the day of the
incident.

       The Court finds that it must leave it to the jury to
determine whether BNSF should have supplied Ditton with a
brake stick to perform his task with reasonable safety.
The facts, viewed in Ditton's favor, indicate that the
use of a brake stick reduces the force required to
operate the hand brake wheel and reduces the loading on
the operator's lumbar spine.  Ditton also testified that
he specifically asked his superiors for a brake stick to
aid with tying and untying hand brakes, but he was denied
it.  Crucially, there is uncontroverted evidence to show
BNSF provided training on and offered brake sticks to
employees at other yards it operated around the country.
On this evidence, viewing it in Plaintiff's favor and in
light of FELA's relaxed burden, the Court finds that a
reasonable factfinder could find that BNSF breached its
duty to ensure that its workers were reasonably protected
from injury resulting from operation of resistant brake
wheels.  See Tufariello v. Long Island R. Co., 458 F.3d
80, 91 (2d Cir. 2006) (holding that plaintiff had
introduced sufficient facts to overcome summary judgment
on his claim that he required hearing protection to
prevent injury from exposure to loud train horns where he
testified that he asked his superiors for the safety
equipment and was denied it).

       Defendant's argument that Plaintiff is asking BNSF to

provide him with the latest, best, or most perfect
equipment is unpersuasive.  (Def. Mot. at 13-14.)  BNSF
cannot reasonably argue that brake sticks are above and
beyond what is acceptable on most rail yards, since it
uses brake sticks at least at two of its own rail yards.
Defendant also argues that operating the hand brake by
hand is a universally accepted method, therefore brake
sticks are not reasonably necessary.  However, just
because a practice is commonly accepted does not mean it
is reasonably safe under the FELA.  See The T.J. Hooper,
60 F.2d 737 (2d Cir.1932) ("[I]n most cases reasonable
prudence is in fact common prudence; but strictly it is
never its measure; a whole calling may have unduly lagged
in the adoption of new and available devices.").

Because a reasonable juror could agree with Plaintiff
that BNSF should provide brake sticks in order to create
a reasonably safe work environment, the Court DENIES
Defendant's motion for summary judgment on Plaintiff's
brake stick claim.


**4.   Other Acts of Negligence**


Plaintiff has failed to provide any evidence to
establish that BNSF has committed unidentified "other
acts of negligence." (Compl., ¶ 10.)  Plaintiff argues
that "discovery in this case is ongoing," and therefore
it would be premature to grant summary judgment on this
claim.  (Pl. Opp'n at 16-17.)  Plaintiff had nearly eight

months to conduct discovery before Defendant moved for
summary judgment.  In this particular case, the Court
finds that this is sufficient time in which to discover
at least a minimal showing of evidence to support a
claim.  See Beneficial Standard Life Ins. Co. v.
Madariaga, 851 F.2d 271, 277 (9th Cir. 1988) (summary
judgment affirmed where there were more than six months
between the initial appearance and summary judgment);
Brae Trans., Inc. v. Coopers & Lybrand, 790 F.2d 1439,
1443 (9th Cir. 1986) (a party cannot complain if it fails
to pursue discovery diligently before summary judgment).
Since Defendant has demonstrated that "there is an
absence of evidence to support [Plaintiff's] case," the
Court finds that no genuine issue of material fact
exists.  Celotex, 477 U.S. at 325.

The Court GRANTS Defendant's motion for summary
judgment on Plaintiff's claim that BNSF committed "other
acts of negligence."

## 5.  Sole Cause of Injury

Under the FELA, Plaintiff need only establish that
his injuries "result[ed] in whole or in part from the
negligence of [the railroad]."  45 U.S.C. § 51.  Based on
this language, the Supreme Court held that the standard
for causation under the FELA is whether the railroad's
negligence "played any part, even the slightest," in
producing the injury.  Consol. Rail Corp. v. Gottshall,

46

512 U.S. 532, 543 (1994).  However, if the plaintiff's negligence was the sole cause of the injury, then the statutory violation could not have contributed "in whole or in part" to the injury or death, and summary judgment must be granted in favor of the railroad.  See Rogers v. Missouri Pacific R. Co., 352 U.S. 500 504-05 (1957); Beimert v. Burlington Northern, Inc., 726 F.2d 412, 414 (8th Cir. 1984).

BNSF argues that Plaintiff's alleged injury was caused solely by Plaintiff's own negligence, and therefore BNSF is absolved of liability.  (Def. Mot. at 17.)  BNSF rests this claim on the fact that Ditton's actions do not wholly conform with TY&E Safety Rule 13.6.6 which states that "[i]f the wheel does not easily release the brake, apply air to the car or get help."  By continuing to pull the wheel once it was difficult, BNSF argues, he violated this provision and therefore is the sole cause of his negligence.  (Def. Mot. at 18.)

This argument is without merit.  Based on all of the arguments described above, there is sufficient evidence to show that it is at least reasonable that BNSF's negligence contributed to Ditton's injuries.  Most directly on point here, Ditton produces facts to show that his training did not include the provision of Rule 13.6.6 above, therefore, BNSF could at least be responsible in part for Ditton's injuries due to inappropriate training.  Ditton also produced two experts who opined that BNSF knew or should have known that

1 requiring trainmen to release brakes by hand put those
2 workers at substantial risk of injury.  (Hayes Report ¶
3 26.)

4      Given the low bar necessary to present a FELA case to
5 the jury, especially on the question of causation, the
6 Court DENIES Defendant's motion for summary judgment on
7 the basis that Plaintiff was the sole cause of his
8 injuries.  See Claar v. Burlington Northern R.R. Co., 29
9 F.3d 499, 503 (9th Cir.1994) ("under FELA the quantum of
10 evidence sufficient to present a jury question of
11 causation is less than it is in a common law tort
12 action").

**IV. CONCLUSION**

15      For the foregoing reasons, the Court GRANTS IN PART
16 Defendant's motion for summary judgment and GRANTS IN
17 PART Plaintiff's motion for partial summary judgment.

20 Dated: _____ 5/21/13        _____
                                          Jesus G. Bernal
                                  United States District Judge